IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| OTIS REAMS, | ) | Case No. 05CV400 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | MEMORANDUM |
| | ) | AND ORDER |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Otis Leon Reams ("Mr. Reams"), seeks review of a decision by the Defendant Social Security Administration ("SSA"), denying Mr. Reams's applications for disability insurance benefits filed under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.*, and supplemental security income filed under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* Mr. Reams originally filed these applications on November 12, 2002. Social Security Transcript ("TR") at 76–78, 416–18. The applications were based on allegations that Mr. Reams has been unable to work since March 15, 2001, due to arthritis, depression, a leg abrasion, and chronic pain in the legs, back, and right shoulder. TR 76, 98. The SSA, on initial review, denied Mr. Reams's claims on May 14, 2003. TR 30. Mr. Reams filed a request for reconsideration, and, after the SSA initiated another review, Mr. Reams's request for reconsideration was denied on September 17, 2003. TR 37.

Mr. Reams filed a request for a hearing on October 2, 2003, and that hearing was held on October 21, 2004. TR 42, 15. Subsequent to that hearing, Administrative Law

Judge ("ALJ"), James Francis Gillet made several findings.  Those were, among others, the following:[1]

> 3. The claimant has the following "severe," medically determinable impairments: Lower back pain; deep vein thrombosis; and major depressive disorder with psychotic features.

> 4. These medically determinable impairments do not meet or equal ones described in the Listing of Impairments at Appendix 1, Subpart P, regulations No. 4.   The claimant's depression has caused moderate restriction of activities of daily living; marked difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.  The "Part C" criteria are not met.

> . . . .

> 11. The claimant has the residual functional capacity to perform a significant range of light work . . . .

> 12. Although the claimant's exertional limitations do not allow him to perform the full range of light work, . . . there are a significant number of jobs in the national economy that he could perform.

TR 22–23.  The ALJ upheld the SSA's decision, finding that Mr. Reams was not entitled to a period of disability or disability insurance benefits, and not eligible for supplemental security income payments.  TR 24.

---

[1]Before stating these findings, the ALJ made several determinations concerning credibility and weight.  Significantly, the ALJ stated that Mr. Reams's condition was not as severe as he alleged because: (i) "he at times responds with vague answers or refuses to answer questions or speak for extended periods of time," TR 18; (ii) there is a "lack of almost any attempt to obtain psychiatric help," TR 19; and (iii) he "resigned from his most recent job," TR 19.

The ALJ also partially discredited two mental health specialists who met with Mr. Reams.  The first, Dr. Amy Corey, was discredited because the ALJ found that "she bases her conclusions upon reports by the claimant."  TR 19.  The other, Dr. Joseph Stankus, was discredited because the ALJ found that "[i]t is unclear whether [Dr. Stankus] is well qualified or a sort of 'hired gun,'" and that his conclusions "are based on only one interview with the claimant and are inconsistent with other evidence of record."  TR 18–19.

Ultimately, the ALJ determined that Mr. Reams did have problems, but that Mr. Reams "chooses to live 'day-to-day,'" and that "these [problems] are the result of the claimant's homelessness rather than due to his medical condition."  TR 19.

On July 25, 2005, the Appeals Council denied Mr. Reams's request for review.  TR 6.  Mr. Reams now seeks judicial review of his claim. This Court has reviewed the record, the ALJ's evaluation and findings, the parties' briefs, the transcript, and the applicable law. For the reasons stated below, this Court concludes that the ALJ's findings are supported by substantial evidence on the record as a whole, and consequently affirms the ALJ.

## Medical Background

Mr. Reams was born on June 20, 1953, and was 49 years old when he first filed his applications for Title II and Title XVI benefits.  Although he only completed the tenth grade of high school, he eventually earned his GED, and has past work experience as a cleaner, landscape laborer, hand packager, security officer, production helper, school bus driver, and bouncer.  TR 16.

Around the end of 1995, Mr. Reams started to complain about swelling in his leg, and for about a year and a half visited the emergency room or the Family Practice Center at the University of Nebraska Medical Center.  TR 195.  Throughout that time, he had been given support hose and prescribed dyazide, and was eventually prescribed hydrochlorothiazide.  TR 195.

During a visit on June 20, 1997, Dr. Leeroy Meyer noted that although the only abnormalities noticed were mild decreased albumin (which suggested chronic venous stasis), that diagnosis did "not correspond with [Mr. Reams's] age and lack of varicose veins." TR 195.  By November 29, 1999, his condition had progressed to a leg ulceration, although it was noted that the "[l]eft lower ulceration is healing adequately.  No warmth, tenderness, or erythema is noted."  TR 224.

3

By January of 2000, Mr. Reams was working in a job that required him to lift several fifty-pound boxes a day.  Along with the strain of lifting the boxes, Mr. Reams indicated that he occasionally bumped his leg, which caused him a good deal of pain.  TR 223.  On January 20, 2000, Mr. Reams visited the Family Medicine Clinic for the problems he was still having with his legs.  Dr. Paul Paulman examined Mr. Reams and noted "some edema and some changes of chronic venous stasis," with "two areas of ulceration."  TR 223.  Dr. Paulman treated him with DuoDerm, and cleared Mr. Reams for four days' absence from work.

Four days later, Mr. Reams went back to the Family Medicine Clinic for a follow-up appointment.  Dr. John Smith examined Mr. Reams at this visit.  Dr. Smith confirmed Dr. Paulman's diagnosis of a chronic venous stasis ulcer on his left leg, and continued the DuoDerm treatment.  TR 222.

On March 22, 2000, Mr. Reams was seen at the emergency room, where he complained about pain in his left leg, right shoulder, and hip area.  Dr. John Watson examined Mr. Reams and suggested that "his symptoms are related in large part to his work," and that "a few days off would be beneficial for him."  TR 220–21.

On April 13, 2000, Mr. Reams again sought treatment at the Family Medicine Clinic, and was examined by Dr. Smith.  He complained of a burning sensation in his left lower leg.  Dr. Smith noted: "[he] has a large area of post inflammatory hyperpigmentation of about 4 by 6 or 3 by 5 inches in diameter.  He has no current ulceration there.  He does have edema of his lower extremities.  This ulceration has not been active for quite some time.  He also has some ongoing back problems which were not the reason for his visit today.  It sounds as though there maybe something else that he would like to be off work

4

from for a while but he will not share that with me today and I am unable to give him the time off work that he desired for this leg problem." TR 219.  Dr. Smith also noted that "I believe [he is] disappointed that he is not able to get some time off from work for this." TR 219.

On May 25, 2000, Mr. Reams again was seen at the Family Medicine Clinic, complaining about the sore on his leg.  This time, he was treated by Dr. Monty Mathews, who noted that "[h]e's been picking at [the sore on his leg]."  TR 218.  Dr. Mathews prescribed support hose,  and suggested soaking and elevating the legs.

On February 1, 2001, while Mr. Reams was driving, he was rear-ended by another vehicle.  On February 2, he was seen again at the Family Medicine Clinic, complaining of complications stemming from the accident.  He complained of stiffness in his neck and a sore middle back, although he had no problems in his lower back.  He was cleared to be off work until February 19. TR 214.  On February 21, he was seen for a checkup from the February 2 visit, and was cleared to wait until March 3, 2001, before returning to work.  TR 213.

On February 21, Mr. Reams was referred to the physical therapy department at the University of Nebraska, and saw physical therapist Jennifer Fowler several times over the following two months.  After the initial visit on February 21, Ms. Fowler noted that Mr. Reams had an "active range of motion while standing; flexion to approximately 50% limited by pain at the right mid-T-spine.  Right side bending approximately 50% limited by right T-symptoms.  Right rotation approximately 50 to 70% limited by low back pain.  All other movements nonremarkable."  TR 207.

5

During the April 5, 2001, physical therapy session, Mr. Reams asked Ms. Fowler several questions about "the work comp law," to which Ms. Fowler suggested Mr. Reams contact his own lawyer about the "specifics of work comp legalities." TR 201. Ms. Fowler also noted that Mr. Reams was particularly interested in the possibility of a pinched nerve in his neck. Ms. Fowler told Mr. Reams that if he "truly had a pinched nerve, or any other kind of permanent involvement of the cervical spine, he would have had many more symptoms before recently." TR 201. Ms. Fowler reports that at that point, Mr. Reams stated that he did have significant symptoms before, and all along, and that he wanted to get healthy to return for another fifteen years of work. TR 201.

On March 8, 2001, Mr. Reams again saw Ms. Fowler, who noted that Mr. Reams "[o]verall was good," and quoted Mr. Reams as saying "more range of motion than ever." TR 200. Also on March 8, 2001, Mr. Reams visited the Family Medicine Clinic, and was seen by Dr. Robert Bowman. Mr. Reams stated to Dr. Bowman that he had tried to go back to work, but that the pain intensified in his back and he was unable to stay more than a day or two. Dr. Bowman noted that Mr. Reams was tender in the low back, did not have any particular spasm, and had a "pretty good range of motion." TR 211.

On March 29, 2001, Mr. Reams telephoned Ms. Fowler complaining of shoulder blade pain due to a return to work, and had several more questions concerning his "return to work, work comp benefits, and correct diagnosis of [a] pinched nerve in his neck." TR 200. On April 11, 2001, Mr. Reams again telephoned Ms. Fowler, and stated that overall he felt "100% better." TR 198. On May 8, 2001, Ms. Fowler noted that Mr. Reams had not been seen for four weeks, and discontinued physical therapy.

6

On October 11, 2001, Mr. Reams returned to the Family Medicine Clinic for an examination of his back, and was again seen by Dr. Bowman.  That examination showed that there was still slight tenderness but that he had a full range of motion, and Dr. Bowman gave Mr. Reams a full release back to work.  TR 210.

On March 13, 2002, Mr. Reams sought emergency room treatment for the pain and swelling in his left leg.  It was noted by the doctors that saw him that the noninvasive venous examination was not consistent with acute or chronic deep venous obstruction.  TR 240.  Mr. Reams was instructed to wear TED hose and to elevate his leg.  TR 238.

On December 10, 2002, Plaintiff again sought emergency room assistance, complaining of discomfort and inflamation in his left leg.  He was treated for left leg cellulitis, superficial thombophlebitis, and venous insufficiency.  TR 230–31.

On December 11, 2002, Mr. Reams was treated at the Family Medicine Clinic by Dr. Smith.  A noninvasive venous examination indicated a partially compressed small tapering superficial femoral vein.[2]  TR 308.

Dr. Samuel Moessner examined Mr. Reams on March 25, 2003, for complaints of low back problems and deep venous thrombosis. TR 310.  Also, Mr. Reams alleged difficulty sleeping due to pain and lethargy during the day, denied memory loss and hallucinations, and stated that he was depressed due to his financial and health situation.  TR 313–14.  Dr. Moessner described Mr. Reams as attentive, cooperative, and pleasant, with excellent hygiene and grooming.  TR 314, 316.  The examination revealed left lower

---

[2]On February 24, 2003, Mr. Reams was again referred to physical therapy, this time for the venous stasis ulcer on his left leg.  However, after five office visits, it was noted that Mr. Reams failed to follow through with his physical therapy and plan of care, and that he was being discharged from the active files.  TR 343.

extremity lichenification and hyperpigmentation as well as some hyperpigmentation on the right lower leg.  TR 314.  Mr. Reams's left leg ulcerations were healed. TR 314.  Further, back spasms and tenderness, peripheral edema, and mild joint tenderness were noted. TR 316.

On July 2, 2003, Mr. Reams was examined at the Douglas County Health Center. Records from that meeting indicate that although none of his medication had been ordered for several months, he insisted that he continued to take it daily as prescribed.  Further, the records indicate that his answer to his use of the support hose was "questionable," and answers to other questions were "vague and hesitant."  It was noted that he had not returned to physical therapy because he felt he "was done."  Finally, the records indicate some mental issues, and a suspicion of a psychotic disorder.  TR 323.

Amy Corey, Ph.D., examined Mr. Reams on August 12, 2003.  During her examination of Mr. Reams, Dr. Corey observed very slowed psychomotor behavior, detachment, and slowed speech. TR 347.  She noted that Mr. Reams became uncommunicative and withdrawn when asked about mood or perceptual disturbances.  TR 347–48.  He did admit to having visual and tactile hallucinations, and she noted impaired abstract ability and some dissociation during questioning.  TR 347–48.  Dr. Corey found his mood to be of below average intelligence, depressed, and that he demonstrated blunted, flat affect with a lack of "insight into his emotional state and is not aware of his problems." TR 348.  Mr. Reams appeared to be oriented with his memory intact.  TR 347.

Dr. Corey noted that Mr. Reams stated that he slept three to five hours daily, but that he denied having difficulty falling asleep or staying asleep, denied feeling tired during the day, and denied napping.  TR 347.  Dr. Corey opined that Mr. Reams's daily activities

8

were restricted because his psychomotor retardation interfered with his motivation and energy. She also suggested that he would have difficulties in social functioning because he spent most of his time alone and had little investment and interest in having social relationships, but that he did not appear to experience recurrent episodes of deterioration. TR 348, 350.  She noted that Mr. Reams could sustain concentration and attention; and that he could understand, remember, and carry out short and simple instructions under ordinary supervision.  TR 348, 350.  However, Dr. Corey questioned whether Mr. Reams could relate appropriately to co-workers and supervisors.  TR 348.  She estimated Mr. Reams's global assessment of functioning ("GAF") to be 35 and indicated that his prognosis for significant improvement was highly unlikely.  TR 349–50.

On September 11, 2003, Mr. Reams saw another mental health specialist, Dr. Luis Bencomo, at the Douglas County Community Mental Health Center.  Dr. Bencomo noted that Mr. Reams had decreased motivation, but no other overt symptoms of depression. TR 356.  Dr. Bencomo also indicated that Mr. Reams acknowledged sleeping "all the time" and spent time with friends.  TR 356.  He was dressed casually and showed good eye contact, a neutral mood, and constricted affect.  TR 357.  Mr. Reams's psychomotor activity was slowed, his memory was "ok," his thought processes were logical, and his judgment and insight were considered fair/lacking.  TR 357.  Dr. Bencomo stated that Mr. Reams was "vague [and] guarded," and estimated his GAF to be 55–60.  TR 357.  There was no plan to continue treatment upon discharge.  TR 358.

Mr. Reams's counsel arranged for a full psychological evaluation by Joseph Stankus, Ph.D., and he underwent three clinical and testing interviews staring on August 27, 2004.  Dr. Stankus used a battery of psychological tests—WAIS-III, WRAT-3, MMPI-2,

9

and Bloom Sentence Completion Survey—to assess Mr. Reams's cognitive and emotional functioning.  Dr. Stankus identified the possible presence of psychotic behavior, bizarre thought content, difficulties in concentration, attention deficit, memory problems, poor judgment, and difficulty differentiating fantasy from reality. TR 388.  His diagnosis included schizophrenia, undifferentiated type, and pathological gambling in partial remission, with a rule out of major depressive disorder and dysthymic disorder.  TR 390.

Dr. Stankus opined that while Mr. Reams likes to be around people, he spends most of his time alone, "indicating that he prefers to do so, having little investment or interest in establishing and maintaining social relationships." TR 385.  Dr. Stankus also suggested that while "[h]e appears able to sustain concentration and attention needed for task completion, and . . . [is able] to understand and carry out short and simple instructions under ordinary supervision, . . . it is highly doubtful . . . that he would be able to relate appropriately to coworkers and supervisors." TR 385.  He assessed Mr. Reams's current GAF at 35, with the highest in the past year at 40. TR 391.

### Standard of Review

When reviewing an ALJ decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole.  *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). Under this standard, substantial evidence means something "less than a preponderance" of the evidence, *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998), but "more than a

mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Ellison v. Sullivan*, 921 F.2d 816, 818 (8th Cir. 1990). "Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision." *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (citing *Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)). In determining whether the evidence in the record as a whole is substantial, a district court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The substantial evidence standard "allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal." *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir.1991) (citing *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). If the district court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984). Rather, if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)).

**Discussion**

Mr. Reams suggests that the ALJ made four errors in determining that he could

sustain competitive employment.[3]  First, Mr. Reams suggests that the ALJ erroneously

rejected Dr. Stankus's opinion regarding his limitations.  Second, Mr. Reams alleges that

the ALJ improperly rejected his own statements to medical providers regarding the extent

and nature of his psychiatric impairments.  Third, Mr. Reams asserts that the residual

functioning capacity ("RFC") assessment made by the ALJ is not supported by substantial

evidence.  Finally, Mr. Reams believes that the hypothetical questions posed to the

---

[3]Mr. Reams also asks this Court to consider two supplemental reports, which were submitted to the Appeals Council before its review, but after the ALJ conducted his hearing and made his decision. Filing No. 14-2.  "Section 205(g) of the Act, 42 U.S.C. § 405(g), grants reviewing courts the authority to order the Secretary to consider additional evidence, but 'only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Smith v. Shalala*, 987 F.2d 1371, 1375 (8th Cir. 1993) (quoting 42 U.S.C. § 405(g)).  The evidence we are asked to consider, although created after the hearing, consists of reports that could have been produced prior to the hearing.  Mr. Reams, in effect, seeks to add more thorough evidence to reinforce and clarify his earlier position.  However, as the claimant, Mr. Reams bore the burden of proving his disabilities, and "he thus had the responsibility for presenting the strongest case possible." *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  For whatever reason, Mr. Reams "felt these additional records were unnecessary to prove his point; his miscalculation in this regard does not supply good cause for failing to introduce these records in the first instance." *Id.*

However, even if I were to consider the supplemental reports, it is not the type of information that would warrant a reversal of the ALJ.  The supplemental report by Dr. Messih is incomplete, ultimately suggesting that the questions surrounding Mr. Reams's physical health "could be answered more precisely by doppler studies of the venous and arterial circulation of his legs . . . ."  Filing No. 14-2, 14.  The fact that more testing is needed to determine the severity of Mr. Reams's condition does not convince me that the ALJ's decision was not supported by substantial evidence on the record.

Similarly, Dr. Stankus's supplemental report adds very little new information, and concludes with the opinion that Mr. Reams's "condition remains relatively unchanged since the last time that this clinician conducted a psychological evaluation." Filing No. 14-2, 11.  Dr. Stankus's original report was very thorough, and was considered by the ALJ.  I will not reevaluate the same information, although contained in a different report, to find that the ALJ's decision was not supported by substantial evidence on the record.

vocational expert ("VE") were erroneous because, he alleges, the questions did not include all of the relevant medical evidence. These charges of error, along with the applicable law, are discussed below.

## 1. Weight Given to Physicians' Opinions

When reviewing the weight given by an ALJ to a treating physician's opinion, a district court will find error if the ALJ (i) failed to consider or discuss that opinion and (ii) the record contains no contradictory medical evidence. *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)). A treating physician's opinion is not automatically controlling—it must be assessed against the record as a whole and may be discounted if it is inconsistent with other parts of the same opinion or inconsistent with the record as a whole. *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005). Further, a physician's opinion that an applicant is disabled or unable to work is not the type of medical opinion an ALJ need give controlling weight, as it involves a legal conclusion reserved for the Commissioner. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant cannot be gainfully employed, because they are merely opinions on the

13

application of the statute, a task assigned solely to the discretion of the Commissioner."

(internal marks omitted))).

In this case, Dr. Stankus submitted a detailed report outlining his opinion concerning

Mr. Reams's mental condition, which is summarized above. Mr. Reams suggests that the

ALJ erroneously rejected Dr. Stankus's opinions regarding his limitations. In not granting

great weight to Dr. Stankus, the ALJ found the following:

> [Dr. Stankus's] resume includes time as a consultant for various organizations. It is unclear whether [he] is well qualified or a sort of "hired gun." The undersigned has not given great weight to Dr. Stankus'[s] conclusions, which are based on only one interview with the claimant and are inconsistent with other evidence of record. The analysis at Exhibit 22F is detailed, but the limits contained in the residual functional capacity findings of this decision accommodate the functional limits in Exhibit 22F. . . . [Mr. Reams's] WRAT-III results would not preclude 1-, 2-, or 3-step work. His reading, spelling, and arithmetic skill were at the 8th-grade to high school level. The claimant is slow of speech and mannerisms, but his alleged disability is not evidence by the record.

TR 18–19. Although it appears that Mr. Reams visited with Dr. Stankus on several

occasions, and therefore the ALJ was factually incorrect in his assessment of Dr. Stankus's

opinions, the ALJ's final conclusions are supported by the record as a whole. He took into

account the limitations suggested by several doctors, including Dr. Stankus, and identified

serious limitations in Mr. Reams's ability to (i) understand and remember detailed

instructions, (ii) tolerate change, (iii) accept instruction and criticism, (iv) perform within a

schedule, and (v) work in coordination and proximity to others. The ALJ ultimately

disagreed with Dr. Stankus's conclusion that Mr. Reams is disabled and likely to have a

great deal of difficulty ever being able to work. Disability and ability to work are legal

14

conclusions, reserved for the Commissioner, and the ALJ's determination that Mr. Reams

is not disabled is supported by substantial evidence on the record.

## 2. Plaintiff's Own Statements

Before determining RFC, an ALJ must evaluate the claimant's credibility.  The

*Polaski* standard is the guide for credibility determinations.  It provides, in relevant part:

> The adjudicator may not disregard a claimant's subjective complaints
> solely because the objective medical evidence does not fully support
> them. . . .  The absence of an objective medical basis which supports
> the degree of severity of subjective complaints alleged is just one
> factor to be considered in evaluating the credibility of the testimony
> and complaints. The adjudicator must give full consideration to all of
> the evidence presented relating to subjective complaints, including
> the claimant's prior work record, and observations by third parties
> and treating and examining physicians relating to such matters as:
> > 1. the claimant's daily activities;
> > 2. the duration, frequency and intensity of the pain;
> > 3. precipitating and aggravating factors;
> > 4. dosage, effectiveness and side effects of
> > medication;
> > 5. functional restrictions.
> The adjudicator is not free to accept or reject the claimant's
> subjective complaints *solely* on the basis of personal observations.
> Subjective complaints may be discounted if there are inconsistencies
> in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986);[4] *see* 20 C.F.R.  § 404.1529;

*Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003).  Deference is generally granted

to an ALJ's determination regarding the credibility of a claimant's testimony and, in

particular, subjective complaints of pain.  *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir.

2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility,

deference is given to the ALJ's opinion, although each factor may not have been

discussed); *Anderson,* 344 F.3d at 814.

_____

[4]Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a
claimant's statements is the consistency of the claimant's various statements and the
consistency between the statements and the other evidence in the record.  Ruling 96-7p
provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical
> signs and laboratory findings and other information provided by medical sources,
> including information about medical history and treatment.

> * The consistency of the individual's own statements. The adjudicator must
> compare statements made by the individual in connection with his or her claim
> for disability benefits with statements he or she made under other
> circumstances, when such information is in the case record. Especially important
> are statements made to treating or examining medical sources and to the "other
> sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of
> consistency between an individual's statements and other statements that he or
> she has made at other times does not necessarily mean that the individual's
> statements are not credible. Symptoms may vary in their intensity, persistence,
> and functional effects, or may worsen or improve with time, and this may explain
> why the individual does not always allege the same intensity, persistence, or
> functional effects of his or her symptoms. Therefore, the adjudicator will need to
> review the case record to determine whether there are any explanations for any
> variations in the individual's statements about symptoms and their effects.

> * The consistency of the individual's statements with other information in the
> case record, including reports and observations by other persons concerning the
> individual's daily activities, behavior, and efforts to work. This includes any
> observations recorded by SSA employees in interviews and observations
> recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).

The ALJ summarized Mr. Reams's relevant testimony and, although he did not fully describe Mr. Reams's daily activities, he did acknowledge that Mr. Reams's daily activities are restricted.  In evaluating the credibility of Mr. Reams's reports of pain, the ALJ relied on Mr. Reams's own statements relating to his pain and the activities he can perform, and findings contained in physicians' and therapists' records.  The ALJ noted that the mental functional restrictions placed on Mr. Reams, as stated in the report of Dr. Corey,[5] were reflected in the RFC findings.  Further, the ALJ noted that Mr. Reams's own reports of the aggravating and precipitating factors of physical pain were generally reflected in the RFC findings.[6]

Further, the ALJ noted the inconsistencies on the record about Mr. Reams's mental and physical condition.  He noted that there was almost no attempt by Mr. Reams to obtain psychiatric help, and that his treating physicians did not even refer Mr. Reams to a psychological counselor until September 11, 2003.  The ALJ also noted the differences in the examinations, especially between the examination conducted on March 25, 2003, and August 12, 2003, which included several inconsistent statements concerning, among others, sleeping patterns and hallucinations.[7]

---

[5]Dr. Corey opined that Mr. Reams (i) was able to sustain concentration and attention, (ii) was able to understand and remember short and simple instructions, and (iii) was able to carry out short and simple instructions under ordinary supervision, but was not able to relate appropriately to co-workers and supervisors.  TR 350.

[6]Mr. Reams testified that he could walk about three or four blocks at a time, and stand for thirty to forty minutes at a time.  TR 20.  The ALJ made RFC findings that were similar—that Mr. Reams could stand or walk for up to two hours at a time, for a total of six hours during an eight-hour work day.  TR 20.  The ALJ did not err when he found Mr. Reams partially credible, and the variation from what Mr. Reams stated is supported by the record as a whole.

[7]The ALJ found that "[t]here is an extraordinary difference between the consultative examination done on March 25, 2003, and that done on August 12, 2003.  It is as if the reports are from two different people."  TR 18.

17

Finally, the ALJ evaluated Mr. Reams's past job history—the ALJ noted that Mr. Reams resigned from his most recent job.  Other evidence on the record indicates that Mr. Reams acknowledged resigning from several jobs, citing various reasons such as pain, lack of upward mobility, impending downsizing, inability to secure a promotion from a supervisor who did not like him, and trouble with co-employees.  I also take notice of the opinions of various medical providers that Mr. Reams continually asked for time off work, had several persistent questions about workman's compensation benefits, his answers concerning his use of prescribed devises was questionable, vague, and hesitant, and his unwillingness to continue physical therapy.

The record demonstrates that the ALJ performed a sufficient *Polaski* analysis and considered the appropriate factors in determining that Mr. Reams's subjective pain complaints were not fully credible.  The ALJ did give some credibility to Mr. Reams's statements, and found that he had severe impairments that restricted him to a significant range of light work.  The impairments delineated in the findings are substantial limitations[8] and show some deference to Mr. Reams's own statements of his ability to function in the workplace.  However, the ALJ's finding that Mr. Reams was not completely credible—when viewed in light of the *Polaski* factors, the inconsistencies that exist on the record, and his past employment history—is supported by the record as a whole, and consequently is not error.

_____

[8]The ALJ found that Mr. Reams has severe lower back pain, deep vein thrombosis, and a major depressive disorder with psychotic features, and was therefore unable to return to his past relevant work.  TR 20.  These are significant findings indicating a severe limitation.

### 3. RFC Assessment

RFC is defined as what the claimant "can still do despite . . . limitations." 20 C.F.R.

§§ 404.1545(a), 416.945(a).  RFC is an assessment based on all "relevant evidence," *id.*,

including a claimant's description of limitations; observations by treating or examining

physicians or psychologists, family, and friends; medical records; and the claimant's own

description of her limitations. *Id.* §§ 404.1545(a)–(c), 416.945(a)–(c); *McKinney v. Apfel,*

228 F.3d 860, 863–64 (8th Cir. 2000).

As described above, the ALJ did not err when he weighed the relevant evidence,

including Mr. Reams's own statements, the treating and examining physicians and

psychologists, and the medical records; consequently, the RFC findings are supported by

the medical record as a whole.  I also note that the ALJ was in a unique position in that he

was able to ask questions of Mr. Reams and observe his answers.  The ALJ found that Mr.

Reams's "ability to comprehend questions and articulate responses during the hearing was

excellent."  TR 19.  The ALJ did not erroneously find that Mr. Reams's behavior, objective

medical evidence, and other physicians' opinions demonstrated that his disability was not

so severe as to preclude all types of light work.

### 4. Hypothetical Question

To assist an ALJ making a disability determination, a VE is many times asked a

hypothetical question to help the ALJ determine whether a sufficient number of jobs exist

in the national economy that can be performed by a person with a similar RFC to the

claimant.  A hypothetical question is properly formulated if it incorporates impairments

"supported by substantial evidence in the record and accepted as true by the ALJ."

19

*Guilliams*, 393 F.3d at 804 (citing *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)).  "[A] vocational expert's responses to hypothetical questions posed by an ALJ constitutes substantial evidence only where such questions precisely set forth all of the claimant's physical and mental impairments." *Wagoner v. Bowen*, 646 F.Supp. 1258, 1264 (W.D. Mo. 1986) (citing *McMillian v. Schweiker*, 697 F.2d 215, 221 (8th Cir.1983)).  Courts apply a harmless error analysis during  judicial review of administrative decisions that are in part based on hypothetical questions.  For judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003).

As explained above, I find that the ALJ did not err in his credibility determinations or the weight allotted to the physicians and mental health experts, and consequently did not err in the RFC findings.  Therefore, I also find that the hypothetical questions based on those findings were legitimate, and the ALJ properly relied upon the answers provided by the VE at the hearing.[9]

When reviewing an ALJ's opinion not to extend Social Security benefits, a court will affirm the ALJ's opinion if it is supported by substantial evidence on the record.  In this case, it is not possible for me to say that the ALJ's decision falls outside the zone of

---

[9]Mr. Reams insists that the ALJ contradicted himself by finding that Mr. Reams, on one hand, could not return to any of his past jobs (some of which would be classified as light work), while on the other finding that Mr. Reams could perform a significant range of light work. However, I am not persuaded by Mr. Reams on this point.  While his past employment may have included light work, the ALJ did not find that he could perform *all* types of light work, but rather could perform a *significant range* of light work.  The VE named several jobs that accounted for Mr. Reams's RFC, and this finding does not conflict with the ALJ's determination that Mr. Reams cannot return to his past work.

available choice, and I find that substantial evidence supporting the ALJ's decision exists on the record as a whole.

THEREFORE, IT IS ORDERED that the findings and conclusions of the ALJ are confirmed.

DATED this 27th day of September, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge